IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

CRUTCHFIELD PROPERTIES, LLLP,      :
                                                          :
      Plaintiff,                              :          Civil Action No:
                                                          :          4:17-cv-00076- WMR
v.                                                       :
                                                          :
ASHGAN PRODUCTS LLC,              :
GLOBAL ENVIROTECH, LLC,           :
JOHN ASHWORTH, BETTY             :
ASHWORTH, and JOHN F. MORGAN  :
_____        :

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S FIRE DEBRIS ALLOCATION EXPERT, J. ANDREW MONTGOMERY

Come now Global Envirotech, LLC, John Ashworth, and Betty Ashworth, who hereby file their joint Memorandum of Law in Support of Motion to Exclude the Testimony of Plaintiff's Fire Debris Allocation Expert, J. Andrew Montgomery, showing the Court as follows:

### I.    Introduction

This case involves the fire at the Old Barwick Mill warehouse ("OBM") that occurred on November 14, 2015.  Less than a week after the fire, on November 20, Plaintiff, Crutchfield Properties, LLLP ("Crutchfield"), entered into an agreement with the tenant that rented a portion of the warehouse, Ashgan Products, LLC

("Ashgan"), to employ Global Envirotech, LLC ("Global") to clean-up the ash and other materials from the fire, among other things.   Crutchfield and Ashgan each agreed to pay 50% of Global's invoices.   (*See* Exhibit B to First Amended Complaint [Dkt. No. 23]).

In February, 2016, Crutchfield unilaterally terminated Global's role in the cleanup.   Geosyntec was then hired to perform the remaining cleanup work.

Several months later, a lead Geosyntec principal involved in the site cleanup, J. Andrew Montgomery ("Montgomery"), was hired as "consulting experts" by Crutchfield.

Montgomery issued an expert report dated March 30, 2018 that purports to evaluate "the quantity of waste that was managed and disposed off-site during the 2016/2017 Removal Action (RA) at the Older Barwick Mill (OBM) property."   *See* Exhibit 1 (Montgomery Report, p. 1).

Montgomery offers two opinions in his report:   (1) that the portion of the building's structure that was disposed off-site as a result of the fire had a weight of approximately 2,008 tons, and (2) the remaining materials disposed off-site after the fire, totaling 4,686 tons, should be attributed to the tenant, Ashgan, and its so-called "sister company," Global.[1]

---

[1]    The term "sister company" is legally meaningless and will be subject to a motion *in limine* to avoid confusing the trier of fact at the trial.

The opinions of Montgomery are conclusory, fundamentally flawed, or provide no guidance to the trier of fact, and, as such, should be excluded.

## II.   *Daubert* Standard

In *Daubert v. Merrell Dow Pharms*., 509 U.S. 579 (1993), the Supreme Court rejected the previous rule of law requiring "general acceptance" of a theory to be admissible. The *Daubert* Court held that the court is to act as a "gatekeeper" and determine whether expert testimony should be presented, consistent with Rule 702, F.R.E. *Daubert* addressed the admissibility of scientific testimony and identified a nonexclusive list of criteria a court might use in assessing proffered expert testimony.  *Daubert*, at 594-595.

In 1999, the Supreme Court again spoke on the issue of expert testimony in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). In *Kumho Tire*, the Court expanded *Daubert*, providing that the trial judge's general "gate-keeping" obligation applies not only to testimony based upon "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. The Court held that a trial court may consider one or more factors identified in *Daubert* to determine whether an expert's testimony is reliable. *Id*. at 140. The Court warned that "[w]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question [ ], the trial judge must

determine whether the testimony has a 'reliable basis in the knowledge and experience of the [relevant] discipline.'" *Id.* at 149.

As part of its gate-keeping role under Rule 702, a court is tasked with reviewing the proffered expert opinion testimony prior to submitting it to the trier of fact. The requirements for the admission of expert testimony in light of *Daubert* are well known: Expert testimony may be admitted into evidence if (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). There are thus three discrete inquiries: qualifications, relevance, and reliability. *See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (although there is "some overlap" among these inquiries, they "are distinct concepts that courts and litigants must take care not to conflate."). The burden of establishing these three requisites lies with the proponent of the evidence. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*).

Rule 702 provides the expert evidence must assist the trier of fact to understand the evidence or to determine a fact in issue. *See* Federal Rules of Evidence, Rule 702. The evidence must also "concern[] matters that are beyond the understanding of the average lay person.... [p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63.

Similarly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir. 2005) (internal quotes omitted). An expert's unexplained assurance that her opinions rest on accepted principles fares no better. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1222 (11th Cir. 2005). Moreover, "[t]he Daubert requirement that the expert testify to scientific knowledge — conclusions supported by good grounds for each step in the analysis — means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain v. Metabolife*, 401 F.3d at 1245 (internal quotes omitted); *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion."). "Thus, a trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose

factual basis is not adequately explained." *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir. 2005) citing *Frazier*, 387 F.3d at 1266.

### III.    Montgomery Is Not Competent to Testify About the Weight of Disposed Materials that Constitute the Building Structure

Montgomery holds a Bachelor of Science in mechanical engineering, with a minor in applied chemistry, from Kettering University, and a Master's of Science in environmental engineering and sciences from Stanford University.  *See* Exhibit 1, (Report, Attachment A1 (Montgomery Resume)).  Neither degree provides any training related to estimating the weight of a building structure or weight after a fire.

According to Kettering University ("Kettering"), mechanical engineering degree focuses on the design and implementation of <u>mechanical</u> systems involving the conversion, transmission, and utilization of energy.[2]  Specialty programs include automotive engineering design, bioengineering applications, machine design and advanced materials, and alternative energy.[3]  The chemistry program, according to Kettering, focuses on all the major chemical sub-disciplines including organic chemistry, inorganic chemistry, physical chemistry, analytical chemistry, and biochemistry.

---

[2]     *See* https://www.kettering.edu/programs-and-degrees

[3]     *See* https://www.kettering.edu/programs-and-degrees/mechanical-engineering

According to Stanford University, environmental engineering combines elements of the former environmental fluid mechanics and hydrology and environmental engineering and sciences programs.  The program focuses on five themes:  (1) environmental modeling and simulation; (2) environmental and geophysical fluid mechanics; (3) hydrology and water resources; (4) aquatic chemistry & biology and process engineering; and (5) human health and the environment.[4]

On these credentials, Montgomery may have been qualified to offer an opinion on the chemistry of the substances found at the fire, or in the water used to fight the fire, or appropriate remediation efforts, all of which appear to relate to his training and/or experience (*see* Ex. 1 (Attachment A1 to his Report)), but he is not a civil engineer — or even a contractor — and is not trained to analyze the volume of a building structure or volume of that structure after a fire.

When asked at deposition about his education relevant to construction or buildings, the best Montgomery could offer was:  "I think I had one class in undergrad on building design." *See* Exhibit 2 (Montgomery Depo Transcr. p.  52).  That class did not even cover construction.  *Id.* at 53.

Indeed, according to his resume, Montgomery appears to have ***no experience*** in the discipline of construction, or estimating the quantity of

---

[4]     *See* https://cee.stanford.edu/academics/graduate-programs

construction materials, or estimating the quantity of fire debris from a structure after a fire.   *See* Exhibit 1 (Attachment A1 to the Report).   At deposition, Montgomery testified that he had never attempted to analyze the volume of a building structure before (Ex. 2, Depo Transcr. p. 16) and was unaware of any acceptable method for doing so (*id.*, p. 37).

Montgomery's lack of relevant training and experience should disqualify him as an "expert" because he cannot establish competency through training or experience, as required by *Daubert*.  The fact that Montgomery is an "engineer" is not enough.  *Cf. Butler v. First Acceptance Inc. Co., Inc.,* 652 F. Supp. 1264, 1272-73 (N.D. Ga. 2009) (J. Forrester) (holding that an attorney with extensive personal injury and insurance litigation experience is not qualified to opine on the standard of care applicable to an insurance adjustor for purposes of analyzing a claim for tortious failure to settle an insurance claim).

The lack of training and experience is evident in his analysis, too.

### IV.   Montgomery's Opinion on the Weight of Materials to Allocate to Ashgan Is Not Based on Facts and Offers Nothing that Requires Specialized Knowledge

Montgomery offers an opinion that 4,686 tons of the fire debris that was disposed of off-site, as a result of the fire, "consisted of the materials transported to and stored by the tenant Ashgan Products LLC (Ashgan) and its sister company Global Envirotech, LLC (Global in the southern portion of the OBM building. . ."

Exhibit 1, p. 6 (Montgomery Report).  His opinion is based on the weight of the removed debris, which totaled 6,694 tons, less the amount he attributes to the building structure owned by Crutchfield.  *Id.*[5]

In other words, Montgomery performed no analysis of how much of the disposed-of materials 'under the roof' of the building belonged to Ashgan, Crutchfield, or third parties.  He just assumed that everything but the building structure belonged to Ashgan.  That assumption, which is not based on any fact, runs afoul of Rule 702, which requires that any expert opinion be based on "sufficient facts or data."  F.R.E., Rule 702.

When Mr. Montgomery was asked at deposition why materials within the building — that clearly did not belong to Ashgan, such as soils within the pits that were covered by Crutchfield before the Ashgan leased portions of the warehouse – – were still attributable to Ashgan, Mr. Montgomery testified as follows:

> Q:  Do you recall that he [Drennon Crutchfield] had paid a contractor to fill the pits with – to fill the pits prior to leasing the property to Shaw?
>
> A:  I do.  And that they were covered, I do recall.
>
> Q:  And do you think that material, whatever was in the pits, was present when Geosyntec began its removal action?

---

[5]     At deposition, Mr. Montgomery confirmed this calculation, stating:  "I determined how much was associated with the building materials, and the difference from what was shipped off-site would be attributed to materials stored by the tenants in the building."  Exhibit 2 (Montgomery Depo Transcr., p. 16).

A:  I don't know.  I just know that what was in the pits would have been impacted by the fire.

Q:  Well, that's not my question.

A:  Repeat your question.

Q:  If those pits contained materials, and I don't want to call it debris because that seems to be associated with the fire, Geosyntec would have removed that material?

A:  Yes.

Q:  Okay.  Was that material accounted for in any of your calculations?

A:  There wasn't specific break-out of material that was removed from those pits. It was just removed as part of removing all of the fire debris.

Q:  But how does that get accounted for in your methodology to be on the Drennon Crutchfield side of the ledger as opposed to the Ashgan?

A:  Well, I guess my response to that would be, whatever was in the pits before the fire was impacted by the waste material, you know, the latex, the blue liquid, during the fire.  So whether the material – I guess to me there's no distinction.  Whatever was in the pit was in the pit.  It was impacted by the waste material stored by the tenant, so that goes on the ledger side of the tenant.

Q:  What about the asbestos?

A: The –

Q:  Did the asbestos not impact much of the material in the warehouse?

A:  Pardon me?

Q:  Did the asbestos, presence of asbestos not impact most of the debris in the warehouse?

A:  I wouldn't characterize it as "most of the debris."  There was asbestos present, and it was in the material that we disposed off-site.

Q:  And how did you account for that?

A:   That's accounted for in the roofing material estimates.   It's accounted for in the miscellaneous building debris category that --

[Montgomery Depo Transcr. pp. 78-80]

In short, under Montgomery's flawed logic, anything inside the building was "below" the tenant's materials and contaminated by the tenant's material, and, therefore, belongs on the tenant's 'side of the ledger,' but anything below the asbestos-laden roof of the building that collapsed on the tenant's materials and everything else is not attributed to Crutchfield's 'side of the ledger.'[6]

In reality, Montgomery simply did not account for materials owned by Crutchfield that were in the warehouse and removed as part of the cleanup efforts, like materials stacked on the loading dock (*id.* at 97), soils in the building (*id.* at 78, 80, 102-103, 106), and other burned materials in the building such as interior walls and other materials (*id.* at pp. 50, 100-101, 105-106).   He merely assumed that everything but the structure belonged to Ashgan (and/or Global).  He also did not account for the fact that the tenant's burned materials were found, by Geosyntec, to be non-hazardous for disposal purposes, while the building materials had asbestos in them.  *See* Exhibit 3 (Geosyntec Report, April 2017, p. 1).

---

[6]      There is no dispute that the asbestos came from the building structure.  (*Id.* at 129).

Among the problems with Montgomery's logic is that Ashgan only leased a section of the burned-out portion of the warehouse, and Montgomery admits to having no way of knowing where Ashgan's materials were stored (*id.* at 48-49 and 107).

Moreover, when asked at deposition why Montgomery did not attempt to estimate the weight of materials actually attributable to Ashgan, Montgomery claimed to have reviewed Ashgan's log-books and visually compared that against the burned-out debris to determine that the log books could not be used to estimate how much material belonged to Ashgan.  (*Id.* at pp. 139-141).  That type of sloppy, eye-ball "analysis" is unsupported by any scientific method or technical analysis, and is precisely the type of *ipse dixit* opinion condemned by *Daubert.*

In short, Montgomery's analysis of what disposed materials 'belong' to Ashgan is irrelevant, if not misleading.  Given that he made no effort to analyze what portion of the materials in the warehouse, or removed soils, belong to Ashgan or Crutchfield, his opinion on the materials belonging on Ashgan's 'side of the ledger' is not helpful to the trier of fact and should be excluded as speculative.  *Cf. Cooper v. Marten Transport, Ltd.*, Case No. 10-cv-03044, 2012 WL 12835704, at *3 (N.D. Ga. June 4, 2012) (excluding testimony of a causation expert who formed his opinion on speculation rather than material facts in the case).

## V.     Montgomery's Calculation of the Weight of Fire Debris Attributable to the Building Structure is Unreliable

Montgomery's other opinion is that the weight of the disposed building structure was 2,008 tons, and that is the amount that should be attributed to Crutchfield.

In ascertaining the reliability of a particular expert opinion, the Court must consider, to the extent possible, the following non-exclusive criteria: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.   *See Ringk v. Cheminova Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (citations omitted).

With respect to Montgomery's opinion on the weight of the burned building structure, the answer to all four questions is either "no" or "unknown."  Indeed, for the following reasons, among others, his analysis is wholly unreliable:

***First***, Montgomery opines that 90% of the wood in the building structure would have burned and the remaining 10% would be ash.  *See* Exhibit 1 (Montgomery Report, Sections 3.2 and 3.3).  Because Montgomery is not a fire expert, however, he has no basis on which to make that assumption and, instead, relies on a technical article regarding incinerators.   At deposition, he tried to explain that the opinion was based on his knowledge of municipal solid waste

incinerators (Ex. 2, p. 127), but even that is not helpful as the wood was not incinerated in an incinerator.  Moreover, the number does not account for all of the wood that, admittedly, did not burn.  (*Id.* at pp. 90-91).  This type of *ipse dixit* opinion offered by Montgomery must be rejected under *Daubert.  See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305–06 (11th Cir. 2014) ("[N]either Daubert nor Federal Rule of Evidence 702 requires a trial judge to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert ... Instead, the judge is free to conclude that there is simply too great an analytical gap between the data and the opinion proffered....)" (internal quotation marks and quotations omitted).

**<u>Second</u>**, neither Montgomery nor his team measured the pits in the center of the structure that were excavated and assigned – in Montgomery's analysis – to Ashgan (and Global), as discussed above.  In fact, even though Mr. Montgomery did not know the size of those pits (*id.* p.  77), he used an estimated size to reduce the amount of waste attributable to Crutchfield.  To calculate that reduction, Montgomery assumed that 70% of the space in the pits was filled with Crutchfield's building material.  (*Id.* at 158-160)  That, again, is just speculation as, among other things, Montgomery has no basis on which to justify his opinion that 70% of the space in the pits would have been filled.  (*Id.*). The analysis is another leap of faith condemned by *Daubert.  Cf. Rider v. Sandoz Pharmaceuticals*

*Corp.* , 295 F.3d 1194, 1202 (11th Cir. 2002) (upholding a district court's decision to exclude expert testimony on the potential cause of a medical condition because the science did not support the opinion).

**_Third_**, Mr. Montgomery made a series of additional, unsupported assumptions.  He made assumptions about the thickness of wood in the roof building materials, even though he could have measured that thickness from the unburnt portion of the roof.  (*Id.* at 85 – 86).  In addition, he made assumptions about the type of building material that had been used on the property without any basis for having done so.  (*Id.* at 71-72).

**_Fourth_**, Montgomery speculates that there was 40 cubic yards of "miscellaneous fire debris."  He provides no basis for this opinion.  *See* Exhibit 1 (Montgomery Report, Section 3.4) and Exhibit 2 (Depo Transcr. p. 93).  Again, that opinion is nothing more than speculation.

**_Fifth_**, Montgomery failed to support his calculation for the area of the roof that purportedly burned under his calculations.  (*Id.* at p. 82).

Ultimately, in response to a general question about whether Montgomery's methodology was subject to peer review and/or publication, Mr. Montgomery testified:  "I mean, I'm not aware that there'd be a publication on how to estimate a quantity from a, you know, warehouse fire."  (*Id.* at p. 37).

Given that he has no relevant experience or training, his response is what one would expect.   He is not relying on any reliable scientifically tested methodology to arrive at his opinions.   Plaintiff should have hired an expert on fires and construction if it wanted to establish the weight of the burned structure. As it stands, Crutchfield's expert employed a series of speculative assumptions that render his opinion inadmissible under *Daubert.*

## VI.   Montgomery Withheld Information Without Explanation

As part of the file of materials relied upon, Montgomery produced text messages with his colleague, Scott Elder.   Montgomery testified during his deposition that he relied on field notes and other information provided by Elder in forming his opinions.  *See* Exhibit 2 (Montgomery Depo Transcr., pp. 58, 42, 25).

For unknown reasons, however, the text messages with Elder are partially redacted.   *See* Exhibit 4.   There appears to be no explanation in the record, including a privilege log, explaining why Montgomery would be entitled to hide certain information related to his opinions in this case.

Because it is reasonable to assume that information related to his opinions has been improperly withheld, the Court should exclude Montgomery's testimony on this basis too.  *Cf. Mitchell v. Ford Motor Co.*, 2009 WL 593897, 318 Fed.Appx. 821, 825 (11th Cir. 2009) (holding that it is within the district court's

discretion whether to strike an expert report that does not timely provide the basis for the opinions).

## VII.  Conclusion

As the Supreme Court recognized in *Daubert v. Merrell Dow Pharms, Inc.*, Rule 702 plainly contemplates that the district court will serve as the gatekeeper to the admission of expert testimony.  509 U.S. 579 (1993).  Montgomery, while well-educated and clearly experienced in remediation, is not a civil engineer, contractor, or fire expert, and is not qualified to offer an opinion on the weight of the fire debris attributable to the various defendants in this case.  His opinion on the amount of debris attributable to Ashgan and/or Global is not based on any facts or analysis, and his opinion on how much fire debris is attributable to the structure of the building is highly flawed.  In addition, he appears to have withheld information.  For these reasons, the Court should exclude the testimony of Montgomery as an expert on the allocation of fire debris removed from the OBM after the fire.

Respectfully submitted this 17th day of September, 2019.

WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC

*/s/ Scott P. Kerew*
Scott P. Kerew
Georgia Bar No. 416629
Shubhra R. Mashelkar
Georgia Bar No. 475388

*Attorneys for Attorneys for Global*
*Envirotech LLC, John Ashworth, and*
*Betty Ashworth*

3344 Peachtree Road, N.E., Suite 2400
Atlanta, Georgia 30326
404-876-2700
404-875-9433 (fax)
skerew@wwhgd.com
smashelkar@wwhgd.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), the undersigned counsel certifies that the foregoing **Memorandum of Law in Support of Motion to Exclude the Testimony of Plaintiff's Fire Debris Allocation Expert, J. Andrew Montgomery** has been prepared in Time New Roman 14 point, one of the four fonts and points approved by the Court in LR 5.1(B).

This 17th day of September, 2019.

> WEINBERG, WHEELER, HUDGINS,
> GUNN & DIAL, LLC
>
>
> */s/ Scott P. Kerew*
> Scott P. Kerew
> Georgia Bar No. 416629

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the forgoing **Memorandum of Law in Support of Motion to Exclude the Testimony of Plaintiff's Fire Debris Allocation Expert, J. Andrew Montgomery** has been served upon opposing counsel via the Court's ECF system as follows:

Andrew M. Thompson, Esq.
Stephen Edmund O'Day, Esq.
Vickie Chung Rusek, Esq.
Smith, Gambrell & Russell, LLP
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
athompson@sgrlaw.com
*Attorneys for Plaintiff*

<u>Served via U.S. Mail:</u>

Ashgan Products, LLC
306 Workman Road
Chattanooga, TN 37410

John F. Morgan
904 West Dug Gap Mountain Road
Dalton, GA 30720

This 17th day of September, 2019.

WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC


/s/ Scott P.  Kerew
Scott P.  Kerew
Georgia Bar No. 416629
Shubhra R. Mashelkar
Georgia Bar No. 475388

*Attorneys for Global Envirotech LLC*
*John Ashworth, and Betty Ashworth*



3344 Peachtree Road, N.E., Suite 2400
Atlanta, Georgia 30326
404-876-2700
404-875-9433 (fax)
skerew@wwhgd.com
smashelkar@wwhgd.com