IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

CRUTCHFIELD PROPERTIES, LLLP,          :
                                       :
        Plaintiff,                     :        Civil Action No:
                                       :        4:17-cv-00076- WMR
v.                                     :
                                       :
ASHGAN PRODUCTS LLC,                   :
GLOBAL ENVIROTECH, LLC,                :
JOHN ASHWORTH, BETTY                   :
ASHWORTH, and JOHN F. MORGAN           :
——————————————————                     :

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S CHEMICAL SUBSTANCES EXPERT, DUANE GRAVES

Come now Global Envirotech, LLC, John Ashworth, and Betty Ashworth, who hereby file their joint Memorandum of Law to Exclude the Testimony of Plaintiff's Chemical Substances Expert, Duane Graves, showing the Court as follows:

### I.      Introduction

This case involves the fire at the Old Barwick Mill warehouse ("OBM") that occurred on November 14, 2015.  Less than a week after the fire, on November 20, Plaintiff, Crutchfield Properties, LLLP ("Crutchfield"), entered into an agreement with the tenant that rented a portion of the warehouse, Ashgan Products, LLC

("Ashgan"), to employ Global Envirotech, LLC ("Global") to clean-up the ash and other materials from the fire, among other things.   Crutchfield and Ashgan each agreed to pay 50% of Global's invoices.   (*See* Exhibit B to First Amended Complaint [Dkt. No. 23]).

In February, 2016, Crutchfield unilaterally terminated Global's role in the cleanup.  Geosyntec was then hired to perform the remaining cleanup work.

Geosyntec principal, Duane Graves ("Graves"), was hired sometime during the cleanup process to be an expert for Plaintiff, Crutchfield Properties LLLP. Graves was not involved in the day-to-day cleanup, and testified at deposition that he only visited the site once to do a walkthrough in January, 2017, which was over a year after the cleanup had begun.

Graves issued an expert report dated March 29, 2018 that purports to evaluate "whether defendants' waste materials transported to and stored at the Old Barwick Mill (OBM) caused or contributed to the costs incurred by Crutchfield as a result of the fire on November 14, 2015."   *See* Exhibit 1 (Report, p.1). Specifically, the Report covers the following four topics:

- Evaluates the types and sources of waste materials transported by Global Envirotech, LLC (Global) and stored by lessee Ashgan Products, LLC (Ashgan), also formerly known as Ashgandus, LLC, in in the southern portion of the Old Barwick Mill (OBM), 207 West Main Street/412 McLemore Street, LaFayette, Georgia;

- Assesses the Global/Ashgan waste materials for their potential to release and/or produce hazardous substances during and following the

fire that destroyed the Ashgan leased portion of the warehouse on November 14, 2015;

- Considers chemical incompatibilities of the Global/Ashgan waste materials stored in the warehouse; and

- Identifies inconsistencies in reported contents from correspondences, shipping manifests, and post fire observations of materials identifiable in the damaged warehouse.

[Report, p.1]

In his Report, after discussing other superfund sites and fires, including the Constitution Road Drum site, the I-85 fire, and the Sonoma County fire, and his interpretation of the record, among other things, Graves offers nine opinions on page 15 of his Report, including opinions about whether the facility was properly permitted (even though he has no special training in that area of inquiry), whether ███████████████████████████ (which is irrelevant, because Graves repeatedly states that he is not a causation expert, and speculative), and the source of the blue liquid found in the water runoff from the firefighting efforts (which is based on incorrect facts) (*Id.* at p.15).

The opinions of Graves are conclusory, fundamentally flawed, or provide no guidance to the trier of fact and, as such, should be excluded.

## II.   *Daubert* Standard

In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the Supreme Court rejected the previous rule of law requiring "general acceptance" of a theory

to be admissible. The *Daubert* Court held that the court is to act as a "gatekeeper" and determine whether expert testimony should be presented, consistent with Rule 702, F.R.E. *Daubert* addressed the admissibility of scientific testimony and identified a nonexclusive list of criteria a court might use in assessing proffered expert testimony. *Daubert*, at 594-595.

In 1999, the Supreme Court again spoke on the issue of expert testimony in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). In *Kumho Tire*, the Court expanded *Daubert*, providing that the trial judge's general "gate-keeping" obligation applies not only to testimony based upon "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. The Court held that a trial court may consider one or more factors identified in *Daubert* to determine whether an expert's testimony is reliable. *Id*. at 140. The Court warned that "[w]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question [ ], the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of the [relevant] discipline.'" *Id*. at 149.

As part of its gate-keeping role under Rule 702, a court is tasked with reviewing the proffered expert opinion testimony prior to submitting it to the trier of fact. The requirements for the admission of expert testimony in light of *Daubert* are well known: Expert testimony may be admitted into evidence if (1) the expert

is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). There are thus three discrete inquiries: qualifications, relevance, and reliability. *See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (although there is "some overlap" among these inquiries, they "are distinct concepts that courts and litigants must take care not to conflate."). The burden of establishing these three requisites lies with the proponent of the evidence. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*).

Rule 702 provides the expert evidence must assist the trier of fact to understand the evidence or to determine a fact in issue. *See* Federal Rules of Evidence, Rule 702. The evidence must also "concern[] matters that are beyond the understanding of the average lay person.... [p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63.

Similarly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir. 2005) (internal quotes omitted). An expert's unexplained assurance that her opinions rest on accepted principles fares no better. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1222 (11th Cir. 2005). Moreover, "[t]he Daubert requirement that the expert testify to scientific knowledge — conclusions supported by good grounds for each step in the analysis — means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain v. Metabolife*, 401 F.3d at 1245 (internal quotes omitted); *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion."). "Thus, a trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir. 2005), citing *Frazier*, 387 F.3d at 1266.

### III.   Graves Has No Opinion on the Cause of the Fire

As discussed by Graves at deposition, and as reflected in his report, he is not offering an opinion about the cause of the fire.  *See* Exhibit 2 (Graves Depo p. 235 ("Q:  So you don't have any information about the cause of the fire?  A:  I do

not."); p.45 ("Q:  Do you consider yourself to be an expert in determining the cause and origin of fires?  A:  No.")).

Thus, his testimony cannot be used as evidence in support of Plaintiff's negligence claim before the jury, which is based on Plaintiff's assertion that Ashgan's materials caused the fire.  The remaining CERCLA claims will be tried to the Court.

### IV.     Graves' Opinions Will Not Help the Court Understand the CERCLA Claims and Are Otherwise Speculative

Geosyntec, the company that performed the cleanup starting in February 2016, issued a final cleanup report in April 2017.  *See* Exhibit 3 ("April 2017 Geosyntec Report").  In that report, Geosyntec concluded, among other things, that the following work was completed as part of the cleanup:

- Waste characterization sampling to support profiling the fire debris/waste as ***non-hazardous*** waste;

- No action was necessary to address the arsenic in the soils;

- 6,694 tons of fire debris were disposed as asbestos containing material (ACM)/***non-hazardous*** waste at the Santek Redbone Ridges Landfill located in Ranger, Georgia;

- 216,777 gallons of water were disposed as ***non-hazardous*** waste at the Environmental Remedies facility located in Atlanta, Georgia.

[*See* April 2017 Geosyntec Report, p.1 ("Executive Summary") (Emphasis Supplied)]

The letter dated December 1, 2016 from the EPA, attached as Appendix G to the report, confirms that the offsite disposal of fire debris was non-hazardous. [*Id.*, Appendix G]

Graves is a principal at Geosyntec. At deposition, when asked about whether any hazardous waste was disposed of by Geosyntec as part of the cleanup, he testified:



The primary problem with Graves' opinions in his Report, as made plain by the forgoing testimony, is that he fails to connect — through any scientific analysis —the purported hazardous substances or waste he believes existed at the OBM prior to the fire to the ***non-hazardous*** chemical composition of the fire debris and firefighting water that was disposed of by Geosyntec during the cleanup.

Ultimately, most of Graves' opinions are just opinions about what other people testified to at their deposition, without the application of any scientific or technical inquiry. All of the opinions must be excluded under *Daubert*.

## A.     *Flammability of Mohawk and HCF "Wastes"[1]*

In opinion #1, Graves states that "wastes" were stored at the OBM without a permit.  *See* Report, p.15.  He also states that those wastes were combustible at high temperatures, and that certain wastes found in the firefighting water are consistent with the burning of those materials.  *Id.*

Regarding the comment about permitting, Graves is not an expert.  He testified at deposition that he simply read the regulations to determine whether a permit would be required.  *See* Graves Depo. pp. 162 - 163, 56-57.  He admits, however, to being only vaguely familiar with the Georgia EPD permits.  *Id.* at p.58.  And, his area of expertise does not cover permitting.  Graves testified that his area of expertise is "[t]he forensic analysis of fire combustion products.  The thermal decomposition of the materials of concern.  The typical chemical reactions that are likely to occur in a fire and the, you know, the likely outcomes to the environment from fire released materials and derived chemicals."  *Id.* at 46.

Consequently, Graves' opinion about whether the facility was properly permitted should not be allowed.

---

[1]     In an effort to clearly address Graves' opinions, his terminology is adopted for purposes of this motion.  Thus, among other things, the motion refers at times to "waste" when, as will be shown at trial, Ashgan's materials were not waste; they were materials intended to be recycled.   No admission of any fact is intended by the use of Graves' terminology in this motion.

Regarding the opinion about the combustibility of materials, there is no dispute that, at high temperatures, some of Ashgan's materials could have burned. But Graves fails to identify which materials burned, or connect that information to the debris materials tested and cleaned up by his company, Geosyntec, after the fire. He also fails to connect his opinion to any purported "release" of "hazardous substances" after the fire.[2] Thus, his testimony does not assist the trier of fact with the CERCLA claims.

**B.**   ***Chattem Chemicals***

In opinions #2, #3, #4 and #6, Graves asserts a series of opinions about the Chattem chemicals brought to the OBM (and removed) about 18-months before the fire. *See* Report, p.15. The opinion in #3, that mixing the Chattem materials did not yield a viable product, is nothing more than a regurgitation of the record and has no bearing on material disputed facts in the case. ███████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

---

[2]   To the extent that this opinion is offered generically to give Graves the opportunity to discuss the Constitution Road Drum superfund site, the I-85 fire, or the Sonoma fire, as discussed in the background sections to his report, such testimony would be highly prejudicial and otherwise improper. All objections to Graves' wide-ranging, baseless opinions about the similarity of the OBM to other sites are preserved and should be excluded, as discussed at the end of this motion.



The opinion in #6, ███████████████████████████ ████████████████████ is legally meaningless as that is not the standard for CERCLA liability, and is otherwise confusing and speculative for the reasons discussed above.

Ultimately, like the prior opinion, it is unclear how this testimony assists the trier of fact.  *Cf. Hudgens, supra*, 328 F.3d at 1344 ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion."); *Cooper v. Marten Transport, Ltd.*, Case No. 10-cv-03044, 2012 WL 12835704, at *3 – 4 (N.D. Ga. June 4, 2012) (excluding testimony of a causation expert who formed his opinion on speculation rather than material facts in the case).

Graves ████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ *Compare* April 2017 Geosyntec

Report, p.1 ("Executive Summary").

### C.    *Ashgan Purportedly Brought Hazardous Materials to the OBM in Violation of Permitting Requirements*

In opinion #5, Graves again comments about a lack of a permit at the OBM.

*See* Report, p.15.   As discussed above, he has no expertise in hazardous waste

permitting and, accordingly, should not be permitted to testify on that issue.

In the same opinion, Graves states that Ashgan and Global brought

hazardous and/or dangerous materials in the form of Chattem waste and

fluorescent lighting tubes and bulbs into the OBM.   His "expert" opinion on those

two points is solely derived from the testimony of fact witnesses, and does not

qualify as scientific, technical or otherwise specialized knowledge that will help

the trier of fact in this case.   *Compare* F.R.E., Rule 702.

Moreover, as discussed in detail above, Graves' opinions about the chemical

makeup or characteristics of the Chattem are merely speculative.   ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ With regard to the lightbulbs, Graves is

not aware of any evidence of lightbulb "waste" that was located or removed after

the fire.   *See* Graves Depo p. 250.

Like the prior opinions, the main problem with these opinions is that they have no bearing on the material facts in dispute in this case and will not help the trier of fact determine the parties' CERCLA liability.

### D.  *Blue Firefighting Water*

Graves states in opinions #7 and #8 of his report that the blue dye in the firefighting water came from Ashgan's latex waste, which he contends was mixed with carpet dyes, and not the ***subgrade*** basement area where Crutchfield may have stored dyes.  *See* Report, p.15.

Graves' only 'scientific' support for this contention is his opinion that the blue liquid samples collected immediately after the fire contained a high concentration of styrene, a partial product of the combustion product from the fire of styrene butadiene latex (i.e., the "latex waste").  *Id.*

The problem with his analysis is that Graves does not rule out the equally likely possibility — if not more likely — that the blue dye and styrene may have come from different sources and mixed together in the water runoff used to fight the fire.  Indeed, just because used firefighting water has more than one substance in it, after pouring the water all over the site and allowing that water to run off, does not mean that two substances in the water came from the same source.  The lack of scientific rigor underlying Graves' opinion is not acceptable under *Daubert*.  *See National Surety Corp. v. Georgia Power Co.*, Case No. 2:17-cv-68-

RWS, 2019 WL 4394403, at * 4-6 (N.D. Ga. Sept. 12, 2019) (slip copy) (failing to rule out alternative explanations justifies exclusion under *Daubert*).

Indeed, in his report, Graves admits that the "chemical structure of the blue dye has not been identified." Report pp. 12-13.  At deposition, Graves admitted that he did not know what type of dyes were used by Mohawk.  Graves Depo. p. 84.  In other words, he cannot be sure of its source through any scientifically identifiable methodology.

Also, Graves does not have any proof that the purported latex in Ashgan's calcium carbonate was styrene butadiene latex.  He could have tested the "latex waste" from Mohawk — the source — in order to confirm his theory.  He did not do so.  *See* Graves Depo p. 222.  Moreover, he maintained no samples of any of the materials.  *Id.* at pp. 224, 226.  Rather, Graves relies an old report dating back to 2011 to show that the latex was styrene butadiene resin.  Report, p.5 (*citing* Styron, 2011).  Using that report, however, is speculative, as it was years before any material was placed at the OBM by Ashgan.

Moreover, Graves incorrectly assumed that the basement was subgrade (*i.e.*, below ground) to conclude that the dyes could not have come from there,[3] even though that assumption is unsupported by any fact.  *See* Graves Depo. pp. 75-76

---

[3]    Exhibit 1, Report p.12 ("The basement is below grade with only one access . . . making a surface release of blue liquid improbable unless the entire basement was completely filled with water to overflowing.").

(testifying that he does not know if the basement was subgrade, and had assumed it was based on the testimony of Ricky Payne); pp. 195-196 (same)). Graves, meanwhile, turns around and condemns – as speculative – the first-hand observations of the EPD, which found that the source of the dyes was the basement. Graves Depo. p.71-72.

In reality, Graves' explanation for why the source of the dyes was the "latex waste" ignores that his own team at Geosyntec took the dyed-blue runoff water, loaded it into a massive vacuum truck, and then sprayed the blue water all over the fire debris in order to "dispose" of it. *See* April 2017 Geosyntec Report, pp. 14 – 16 (noting several times the use of vacuum trucks to dispose of water onto the fire debris) and Exhibit F (Bates Labeled "Crutchfield 00434 – 00436," showing Geosyntec spraying the reclaimed blue water all over the fire debris to be hauled away)). Nowhere in Graves' "expert" opinion does he account for the fact that the blue water was spread all over the fire debris by his own company. Instead, he just assumes that the blue coloring found on the burned out calcium carbonate totes meant there was blue dye in those totes. *See* Graves Transcr. p.63.

Graves also assumed there were multiple colors of dye stored in the basement, and that they would have mixed together and created another color other than blue, without any basis whatsoever for making that conclusion. *See* Report, p.15 (Opinion #8). Moreover, that same flawed logic would mean that the

purportedly colored calcium carbonate totes (i.e., the latex waste totes), which came in different colors, according to Graves,[4] would have mixed together, forming a color other than blue.

In short, Graves' speculative and unsupported conclusions about dyes originating from the calcium carbonate totes (*i.e.*, purported "latex waste"), which he never tested, are the type of *ipse dixit* opinion condemned by *Daubert*.  *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305–06 (11th Cir. 2014) ("[N]either Daubert nor Federal Rule of Evidence 702 requires a trial judge to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert ... Instead, the judge is free to conclude that there is simply too great an analytical gap between the data and the opinion proffered....)" (internal quotation marks and quotations omitted).

That opinion should be excluded.

Also, as with the other opinions, it is unclear how the source of the blue dye has any bearing on this case given that he has not shown, or even attempted to show, that the blue dye is a source of hazardous substance under CERCLA.

---

[4]     Graves relies on the testimony of Ricky Payne to conclude that latex waste "arrive[d] at OBM in various colors including dark blue, light blue, green, yellow, brown, black, white, purple and pink."  Exhibit 1 (Report, p.4).

### E.      *Ashgan's "Wastes" Caused or Contributed to the Costs Incurred by Crutchfield as a Result of the Fire on November 14, 2015*

In opinion #9, Graves states that:  "The Mohawk, HCF, and Chattem wastes transported to and stored at OBM by Global and Ashgan caused and contributed to the costs incurred by Crutchfield as a result of the fire on November 14, 2015." Report, p.15.

***First***, to be clear, Graves explained several times at his deposition that he did not analyze the cause of the fire.  Thus, he cannot testify that Ashgan's materials caused the cleanup costs.

***Second***, whether Ashgan's materials cost money to haul away in connection with the fire is a meaningless opinion.  It is not the standard for determining liability or contribution under CERCLA.  If none of the Ashgan materials were a hazardous substance, and/or there was no hazardous substance released, as is the apparent conclusion in the Geosyntec Report dated April, 2017 (Ex. 3), then the fact that Crutchfield had to pay to ship away the Ashgan materials that were destroyed by the fire has no bearing on the CERCLA claims, even if doing so "contributed" to the costs of cleanup.

In other words, the opinion is not helpful to the trier of fact, is conclusory, and is not based on any specialized training or knowledge.  It runs afoul of Rule 702 of the Federal Rules of Evidence.  *See Cook, supra*, 402 F.3d at 1111; *Frazier*, 387 F.3d at 1262-63 ("[p]roffered expert testimony generally will not help the trier

of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").

### F.   Miscellaneous Opinions on Unrelated Fires and Superfund Sites Should Be Excluded

Finally, scattered throughout the background section of his report, Graves offers a number of opinions about similarities between the OBM and other fires or superfund sites, such as the Constitution Road Drum site, the I-85 fire, and the Sonoma Fire.  *See* Graves' Report.

For instance, on page 10, he opines that "[t]he materials consumed by the I-85 fire are chemically identical to the wastes stored at OBM."  Graves has no way to show that fact, and has not shown that fact.  Such baseless opinions must be excluded under *Daubert*.  *See Frazier*, 387 F.3d at 1262-63.  Among other things, Graves admits that he did not sample and test any of the materials at the OBM that he offers an opinion on.

Likewise, Graves opines on page 10 of his report that the Sonoma Fire (known as the "Tubbs" fire), which burned 36,807 acres, killed 22 people, and destroyed approximately 5,600 structures, is somehow similar to this fire.  The analogy, again, is baseless, unhelpful, and highly prejudicial, and must be excluded under *Daubert*.  *See Frazier*, 387 F.3d at 1262-63.

In addition, on pages three to four of the report, Graves draws opinions about the intent of Mohawk and Global to dispose of Mohawk's materials based on

the Constitution Road Drum site that was deemed a superfund site in 2004. That type of speculative opinion, which is not founded on science, is the type of conjecture that *Daubert* prohibits.

For the forgoing reasons, and because Graves expressly limits his opinions to those expressed on page 15 of his Report (Graves Depo. p. 162), he should not be permitted to testify about other fires and other superfund sites, or draw analogies to those events.

### V.    Conclusion

In conclusion, Graves fails to connect any purported "hazardous substances" that Graves believes were "stored" at the OBM, before the fire, with any materials found after the fire. As the Supreme Court recognized in *Daubert v. Merrell Dow Pharms, Inc.*, Rule 702 plainly contemplates that the district court will serve as the gatekeeper to the admission of expert testimony. 509 U.S. 579 (1993). Graves' opinions are not helpful to the trier of fact, fail to apply scientifically sound methodology, and are otherwise conclusory. For the forgoing reasons, the Court should exclude the testimony of Graves as an expert on the various opinions offered in his report.

Respectfully submitted this 17th day of September, 2019.

WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC

 /s/ Scott P. Kerew
Scott P. Kerew
Georgia Bar No. 416629
Shubhra R. Mashelkar
Georgia Bar No. 475388

*Attorneys for Attorneys for Global
Envirotech LLC, John Ashworth, and
Betty Ashworth*

3344 Peachtree Road, N.E., Suite 2400
Atlanta, Georgia 30326
404-876-2700
404-875-9433 (fax)
skerew@wwhgd.com
smashelkar@wwhgd.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), the undersigned counsel certifies that the foregoing **Memorandum of Law to Exclude the Testimony of Plaintiff's Chemical Substances Expert, Duane Graves,** has been prepared in Time New Roman 14 point, one of the four fonts and points approved by the Court in LR 5.1(B).

This 17th day of September, 2019.

WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC


_/s/ Scott P. Kerew_
Scott P. Kerew
Georgia Bar No. 416629

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2019, a true and correct copy of the forgoing **Memorandum of Law to Exclude the Testimony of Plaintiff's Chemical Substances Expert, Duane Graves,** has been served upon opposing counsel via the Court's ECF system as follows:

Andrew M. Thompson, Esq.
Stephen Edmund O'Day, Esq.
Vickie Chung Rusek, Esq.
Smith, Gambrell & Russell, LLP
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
athompson@sgrlaw.com
*Attorneys for Plaintiff*

Served via U.S. Mail:

Ashgan Products, LLC
306 Workman Road
Chattanooga, TN 37410

John F. Morgan
904 West Dug Gap Mountain Road
Dalton, GA 30720

 */s/ Scott P. Kerew*
Scott P. Kerew
Georgia Bar No. 416629